UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID MUGOMOKE, | No. 13-cv-00984-KJM-KJN |
| Plaintiff, | |
| v. | ORDER |
| MARK HAZUDA, et al., | |
| Defendants. | |

The parties' competing motions for summary judgment are currently pending before the court.  (Pl.'s Mot. Summ. J., ECF 14; Defs.' Cross-Mot. Summ. J., ECF 15.)  The court conducted a hearing on both motions on May 29, 2014, at which Nadia Farah appeared for plaintiff and Audrey Hemesath appeared for defendants.  As explained below, the court REMANDS the case to the United States Citizenship and Immigration Services ("USCIS") for consideration of plaintiff's arguments based on the Charter of the United Nations ("UN Charter") concerning the legality of the relevant actions.

/////

/////

/////

/////

/////

1

I. <u>RELEVANT BACKGROUND</u>[1]

This immigration case for declaratory and injunctive relief arises out of the denial by USCIS of plaintiff's application to adjust his status from an asylee to that of a permanent resident. (*See* Pl.'s Compl., ECF 1.) Plaintiff was born in Rwanda to an ethnic Hutu father and a Tutsi mother. (AR 49.) As a result of the Hutus' hostility towards Tutsis in Rwanda, plaintiff's family had to move from one African country to another regularly. (*See id.* 111.)

In 1990, when a war began between the Hutus and Tutsis in Rwanda (*id.*), the Rwandan Patriotic Front ("RPF") invaded Rwanda from Uganda. (*Id.* 111–12.) In 1991, when in Uganda (*id.* 112), plaintiff joined the Youth Wing of the RPF. (*Id.* 49.) As a member of the Youth Wing, plaintiff "conducted fundraising and participated in cultural education of Rwandese refugees in Tanzania and Uganda." (*Id.* 49–50.) The Youth Wing was not a military group. (*Id.* 112.)

In 1994, while plaintiff was in Tanzania, what has been described as the "Rwandan Genocide" began. (*Id.* 50.) In the same year, plaintiff was mobilized by the RPF to join the Rwandan Patriotic Army ("RPA"). (*Id.*) As a member of the RPA, plaintiff received military training at Gabiro Training Camp; however, because "the genocide was over by the time plaintiff was finished with training[,] . . . he never participated in combat and was never present at any battles." (*Id.*)

After the war was over, plaintiff held various positions within the new government established by the RPF. (*See id.*) However, in 2001, plaintiff was arrested on suspicion of treason. (*Id.* 114–15.) Eventually, plaintiff escaped from Rwanda and, in 2003, entered the United States on an F-1 student visa. (*Id.* 102.) In the same year, plaintiff filed for asylum and in 2004, USCIS granted plaintiff's asylum application. (*Id.* 44.) In granting plaintiff's asylum, the immigration officer found plaintiff's testimony to be credible (*id.* 49) and found no factors existed that would make plaintiff ineligible for asylum (*id.* 52).

---

[1] Because the parties do not dispute the material facts and rely on the certified Administrative Record lodged with the court (ECF 13 ("AR")), the court treats the following relevant facts as undisputed for purposes of this order.

Subsequently, in 2005, plaintiff applied for an adjustment of status from an asylee to that of a permanent resident. (*Id.* 33.) The application remained pending for several years, and in 2012, USCIS denied plaintiff's application. (*See id.* 1–3.) USCIS denied plaintiff's application because it found (1) plaintiff had received "military-type training from the RPA" and (2) plaintiff had solicited funds for the RPF. (*Id.* 3.) It is that decision plaintiff now argues was erroneous. (*See* ECF 1.) In arguing that USCIS's decision was erroneous, plaintiff "seeks judicial review under the Administrative Procedure[] Act [("APA")] of the denial of his application . . . and an order that his application be approved." (*Id.* ¶ 1.) As noted above, both sides have moved for summary judgment. (ECFs 14, 15.) The parties have timely filed their respective opposition and reply briefs. (ECFs 15, 16, 18.)

II. <u>JURISDICTION</u>

Before reaching the parties' substantive arguments, the court must determine whether it has jurisdiction over this case, whether the parties contest it or not. *See Cabaccang v. U.S. Citizenship & Immigration Servs.*, 627 F.3d 1313, 1315 (9th Cir. 2010).

It is well-established that federal courts are courts of limited jurisdiction, possessing "only that power authorized by Constitution and statute . . . , which is not to be expanded by judicial decree . . . ." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (internal citations omitted). "It is to be presumed that a cause lies outside this limited jurisdiction, . . . and the burden of establishing the contrary rests upon the party asserting jurisdiction . . . ." *Id.* (internal citations omitted). Moreover, while there is a "strong presumption in favor of judicial review of administrative action," *I.N.S. v. St. Cyr*, 533 U.S. 289, 298 (2001), there is heightened "judicial deference to the Executive Branch . . . in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations," *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (internal quotation marks omitted).

Generally, courts are empowered to conduct judicial review of agency actions under federal question jurisdiction. 28 U.S.C. § 1331; *see Califano v. Sanders*, 430 U.S. 99, 105 (1977) (holding that the APA itself does not provide an independent basis for subject matter

jurisdiction). Under the APA, an agency action is subject to judicial review if (1) a statute makes it reviewable or (2) the action is final and one for which there is no other adequate remedy. 5 U.S.C. § 704. Although "[n]o statute authorizes judicial review over denials of status adjustment . . . ," *Cabaccang*, 627 F.3d at 1315, "[w]ithout a pending removal proceeding, a denial of status adjustment is final because there is no appeal to a superior administrative authority[,]" *id.* at 1317.

Nevertheless, the APA also withdraws jurisdiction to review agency decisions when "(1) statutes preclude judicial review[] or (2) [when] agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(1)–(2). At first glance, 8 U.S.C. § 1252(a)(2), captioned "Matters not subject to judicial review," may appear to contain one such provision. Specifically, subparagraph (B), titled "Denials of discretionary relief," provides that "regardless of whether the . . . decision . . . is made in removal proceedings, no court shall have jurisdiction to review"

> any . . . decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

*Id.* § 1252(a)(2)(B)(ii).[2] While the heading of § 1252(a)(2)(B)(ii) is "Judicial review of orders of removal," the Ninth Circuit has confirmed that the jurisdictional limitations stated in that section "also apply to review of agency decisions made outside of the removal context." *Mamigonian v. Biggs*, 710 F.3d 936, 943 (9th Cir. 2013) (internal quotations marks omitted). In light of § 1252(a)(2)(B)(ii)'s language, the court directed the parties to file supplemental briefs on the sole question whether the court has jurisdiction to entertain this case. (ECF 19.) The parties filed a joint supplemental brief, stating jurisdiction was uncontested. (ECF 20.)

After considering the parties' briefs and arguments at the hearing, the court finds that in light of the narrow scope of the review sought, the court has jurisdiction to review USCIS's determination of plaintiff's admissibility because whether plaintiff is inadmissible depends on the application of nondiscretionary statutory grounds. *See Mamigonian*, 710 F.3d at

---

[2] All short form statutory citations refer to Title 8 of the United States Code.

4

942 (noting a plaintiff "may choose to bring a claim under the APA in district court[,] [arguing] that USCIS improperly denied her adjustment-of-status application on nondiscretionary grounds").

Plaintiff filed an application to adjust his asylee status to that of a permanent resident under 8 U.S.C. § 1159.  (AR 32.)  While under that section the ultimate authority to adjust an asylee's status to that of a permanent resident is within the Attorney General's discretion, *id.* § 1159(b)(5), nothing in the statute makes the determination of an asylee's admissibility discretionary.  Because the determination whether plaintiff is admissible is a question of law, this court has jurisdiction to review that determination.  *See Spencer Enterprises, Inc. v. United States*, 345 F.3d 683, 690 (9th Cir. 2003) (to bar review, the statute must give the Attorney General "pure discretion, rather than discretion guided by legal standards").

III.     STANDARD OF REVIEW UNDER THE APA

Generally, the standard of review in immigration cases depends on the nature of the decision being reviewed.  *See Manzo-Fontes v. INS*, 53 F.3d 280, 282 (9th Cir. 1995) (analyzing the different standards).  As noted previously, district courts are empowered to review agency action under the APA.  5 U.S.C. § 701, *et seq*.  In conducting their review, courts must determine whether the agency's actions, findings and conclusions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. . . ."  5 U.S.C. § 706(2)(A).

The standard of review "is a narrow one" because courts must not substitute their judgments "for that of the agency."  *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  At the same time, however, the court's inquiry must be "searching and careful."  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks omitted).  Under this narrow standard, a decision is arbitrary and capricious

> only if the agency relied on factors Congress did not intend it to consider; entirely failed to consider an important aspect of the problem; or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

/////

/////

5

*Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) (internal quotation marks omitted). "In making this inquiry, [the court must] ask whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Natural Res. Def. Council v. Dep't of the Interior*, 113 F.3d 1121, 1124 (9th Cir. 1997) (internal quotation marks omitted). The court's review "is based on the administrative record[,] and the basis for the agency's decision must come from the record." *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841 (9th Cir. 2003).

Moreover, the interpretation of the Immigration and Nationality Act ("INA") by the USCIS "is entitled to deference and should be accepted unless demonstrably irrational or clearly contrary to the plain meaning of the statute." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 768 (9th Cir. 1985) (internal quotation marks omitted).

IV.   LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[3]

This standard does not change when the parties file cross-motions for summary judgment: the court must apply the same standard and rule on each motion independently because the granting of one motion does not necessarily translate into the denial of the other unless the parties rely on the same legal theories and same set of material facts. *See Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010).

In the present case, because the material facts are not in dispute, the only question before the court is whether summary judgment is appropriate as a matter of law. *See Sierra Club*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) ("Summary judgment . . . serves as the mechanism for

---

[3] Rule 56 was amended, effective December 1, 2010. However, it is appropriate to rely on cases decided before the amendment took effect, as "[t]he standard for granting summary judgment remains unchanged." FED. R. CIV. P. 56, Notes of Advisory Comm. on 2010 amendments.

1  deciding, as a matter of law, whether the agency action is supported by the administrative record
2  and otherwise consistent with the APA standard of review.").

3  V.     DISCUSSION

4         Plaintiff makes three principal arguments, the last two of which challenge the
5  USCIS action as arbitrary and capricious. First, plaintiff reasons USCIS is bound under
6  "principles of res judicata" by the asylum office's initial determination that plaintiff "had not
7  engaged in disqualifying terrorist activity." (ECF 14 at 2.) Second, "USCIS['s] determination
8  that the RPF and RPA were 'terrorist organizations' was erroneous." (*Id.*) Finally, RPA's and
9  RPF's activities were not unlawful because the activities arose in the context of "a legitimate
10 revolutionary struggle against a genocidal regime." (*Id.* at 3.)

11        As to plaintiff's first argument, defendants respond that the INA "does not
12 contemplate collateral estoppel between the two applications." (ECF 15 at 3.) Second, USCIS's
13 determination that RPF's and RPA's activities met the definition of "terroristic activity" is
14 supported by the administrative record. (*Id.* at 3–4.) Finally, courts have rejected "the suggestion
15 that liberation movements are exempted from the terrorism-related inadmissibility grounds." (*Id.*
16 at 21.)

17        Before addressing the parties' arguments, the court provides a brief summary of
18 the statutory labyrinth at play.

19        A.     Statutory Framework

20        Given the historical actuality that this nation's early settlers were refugees, the
21 United States has continued to maintain a strong policy of providing asylum to persons escaping
22 their homelands to avoid persecution based on, *inter alia*, political and religious views. *See*
23 8 U.S.C. § 1158; s*ee also I.N.S. v. Stevic*, 467 U.S. 407, 414–20 (1984). This policy is reflected
24 in § 1158(a)(1), which provides that "[a]ny alien who is physically present in the United States or
25 who arrives in the United States . . . may apply for asylum in accordance with this section . . . ."
26 Subsection (b)(1)(A) confers on the Attorney General discretion to grant asylum to a person who
27 is a "refugee." *Id.* To meet the definition of "a refugee," "the applicant must establish that race,
28 religion, nationality, membership in a particular social group, or political opinion was or will be

7

at least one central reason for persecuting the applicant." *Id.* § 1158(b)(1)(B)(i). Subsection (b)(2) provides a number of exceptions which, if applicable, will preclude the grant of asylum. *See id.* § 1158 (b)(2)(A)(i–vi). The exception relevant to the present case is articulated in subsection (b)(2)(A)(v), which states that asylum will be denied if the Attorney General determines "the alien is described in subclause (I), (II), (III), (IV), or (VI) of section 1182(a)(3)(B)(i) of this title or section 1227(a)(4)(B) of this title (relating to terrorist activity) . . . ."

Subsection (b)(2)(D) provides that "[t]here shall be no judicial review of a determination of the Attorney General under subparagraph (A)(v)," as articulated above. Additionally, section 1158(c)(2) states that asylum "does not convey a right to remain permanently in the United States, and may be terminated if the Attorney General determines that," *inter alia*, "the alien meets a condition described in subsection (b)(2) of this section . . . ." *Id.* § 1158(c)(2)(B).

Section 1159 governs the adjustment of status of such "refugees." Under that section, "[t]he Secretary of Homeland Security or the Attorney General, in the Secretary's or the Attorney General's discretion . . . may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum who," *inter alia*, "is admissible (except as otherwise provided under subsection (c) of this section) as an immigrant under this chapter at the time of examination for adjustment of such alien." *Id.* § 1159(b)(5). Subsection (c), in turn, provides for coordination with section 1182. *Id.* § 1159(c).

Section 1182 describes numerous grounds for deeming an alien "inadmissible." *See* § 1182(a)(1)–(10). Only one of those subsections, section 1182(a)(3), is relevant to the present case. Under subsection 1182(a)(3)(B)(i), an alien is "inadmissible" if that person "has engaged in a terrorist activity," § 1182(a)(3)(B)(i)(I), or "has received military-type training . . . from or on behalf of any organization that, at the time the training was received, was a terrorist organization (as defined in [subsection 1182(a)(3)(B)(vi)])," § 1182(a)(3)(B)(i)(VIII).

/////

/////

The phrase "engage in terrorist activity" means:

> [I]n an individual capacity or as a member of an organization . . . (IV) to solicit funds or other things of value for (aa) a terrorist activity; (bb) a terrorist organization described in clause (vi)(I) or (vi)(II); or (cc) a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization . . . .

*Id.* § 1182(a)(3)(B)(iv)(IV).

The term "terrorist activity" is defined broadly and includes:

> [A]ny activity which is unlawful under the laws of the place where it is committed . . . and which involves any of the following: . . . (V) [t]he use of any . . . (b) explosive, firearm, or other weapon or dangerous device . . . with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

*Id.* § 1182(a)(3)(B)(iii)(V). In turn, "[t]errorist organization[s]" fall into two categories: designated and undesignated terrorist organizations. *See id.* § 1182(a)(3)(B)(vi). An undesignated terrorist organization, the category relevant to the instant case, is referred to as a Tier III organization and defined as "a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv)." *Id.* § 1182(a)(3)(B)(vi)(III).

B. Analysis

  1. Collateral Estoppel

Plaintiff argues that "USCIS is collaterally estopped from finding plaintiff inadmissible for engaging in terrorist activity because the same issue with the same facts "was previously fully considered and adjudicated" during plaintiff's asylum interview. (ECF 14 at 11.)

Defendants' response is two-fold: first, collateral estoppel does not apply in light of the statutory framework; and second, plaintiff cannot meet the elements of collateral estoppel. (ECF 15 at 13–14.)

   a. Doctrine Explained

The doctrine of collateral estoppel concerns the conclusive effect of a judgment in subsequent actions. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107–08

(1991). The doctrine serves two principal purposes: it protects the parties from re-litigating identical issues and it fosters judicial economy by preventing unnecessary litigation. *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979). Courts have broad discretion to determine whether the doctrine should be applied. *See id.* at 329–31.

The doctrine may properly be applied to court decisions, as well as decisions made by an administrative agency acting in an adjudicative capacity. *See United States v. Utah Const. & Min. Co.*, 384 U.S. 394, 422 (1966). In determining whether to apply the doctrine in the context of administrative proceedings, courts consider whether the parties in the prior proceeding had the opportunity and incentive to completely litigate the same issue. *See id.* Even then, however, there may be a compelling reason not to apply the doctrine because the application would be unsuitable under the existing circumstances. *See Astoria Fed. Sav.*, 501 U.S. at 108. One such reason is where the application of the doctrine would contravene legislative policy, irrespective of the procedural protections provided to the parties in the prior proceeding. *See id.* (noting "the question is not whether administrative estoppel is wise but whether it is intended by the legislature"). Therefore, in deciding whether an agency should have applied the doctrine, the enabling statute should be consulted because it is Congress's prerogative, after weighing of policy objectives, to prescribe the procedures through which an agency will perform its duties and render its decisions. *Id.*; *see also Duvall v. Atty. Gen. of U.S.*, 436 F.3d 382, 387 (3d Cir. 2006) ("Only if Congress required the agency to apply collateral estoppel may the federal courts enforce that obligation.").

b.  Statutory Framework

Here, the court finds the application of the collateral estoppel doctrine unsuitable to the circumstances of this case in light of the two-stage evaluation process requirement for obtaining permanent residency created by Congress. Plaintiff says USCIS is collaterally estopped from finding him inadmissible at the adjustment-of-status stage because USCIS did not find plaintiff inadmissible at the asylum stage. (ECF 14 at 12–13.) That argument is unavailing, as explained below.

/////

1          As set forth above, the governing statutory sections at issue are section 1158 (governing the asylum requirements) and section 1159(b) (governing the adjustment of status of an alien). Each section requires an evaluation of admissibility separate from and independent of the other section. Specifically, under section 1158, a person may not qualify as an asylee if that person meets one of the ineligibility grounds; and under section 1159, one of the requirements of becoming a permanent resident is that the applicant alien be admissible "as an immigrant . . . at the time of examination of such alien." Accordingly, it is evident that Congress provided for a two-stage evaluation: first, at the time of the asylum proceeding and second, at the time of seeking permanent residency. To apply the doctrine and hold USCIS collaterally estopped from evaluating an asylee's eligibility at the time he seeks permanent residency would contravene the legislated process.

         Congress's wisdom in creating a two-step evaluation process has plausible policy support. Under federal immigration laws, for example, an asylee, after obtaining permanent residency, may eventually qualify for citizenship in this country. However, asylum in and of itself "does not convey a right to remain permanently in the United States"; indeed, asylum "may be terminated" for various reasons as set forth in the statute. *See* § 1158(c)(2). Only if an asylee meets the eligibility criteria may an asylee's status be adjusted to that of a permanent resident. *See* § 1159. That now-permanent resident may be eligible for citizenship by way of naturalization. *See* § 1427. Thus, it appears Congress reasonably intended an asylee who may eventually qualify for U.S. citizenship to be evaluated as to that person's eligibility twice, at separate and independent stages.

         c.      Fifth Circuit's Decision in *Amrollah*

         The parties discuss a Fifth Circuit decision, *Amrollah v. Napolitano*, 710 F.3d 568 (5th Cir. 2013), in arguing their respective positions. As explained below, *Amrollah* is not binding and is distinguishable.

         As an initial matter, the court of course is not bound by out-of-circuit decisions. *Int'l Chem. Workers Union Council of the United Food & Commercial Workers Int'l v. N.L.R.B.*, 467 F.3d 742, 748 n.3 (9th Cir. 2006). Additionally, *Amrollah* is factually and procedurally

11

distinguishable from this case. There, the plaintiff, a national of Iran, sought and was granted asylum by an Immigration Judge ("IJ"). *Id.* at 570. In granting asylum, the IJ found that plaintiff supported the mujahedeen movement in Iran; because plaintiff did not commit any violent acts personally, however, plaintiff was not inadmissible under section 1182. *Id.* One year later, plaintiff applied for lawful permanent resident status, and the government denied that application based on plaintiff's support of the mujahedeen movement. *Id.* Subsequently, plaintiff filed a complaint in district court, arguing the government had wrongfully denied his application. *Id.* The district court found the decision was "supported by substantial evidence and that collateral estoppel did not bar USCIS from denying" the application. *Id.*

On appeal, the Fifth Circuit began its analysis by noting that "[a] final decision by an [IJ] has a preclusive effect on future litigation and agency decisions." *Id.* at 571. The Fifth Circuit reasoned, "the IJ's ruling that [the plaintiff] was admissible necessarily included, under the structure of the statute, a finding that [the plaintiff] did not provide support to an individual or organization that engaged in terrorist activities." *Id.* at 572. The court concluded the IJ's finding had "a preclusive effect against a subsequent finding . . . ." *Id.* at 573. In concluding so, the court also noted that the government had "provided [the] court with no reason, whether by legislative history or any other source, to reject [that] reading." *Id.*

In the present case, unlike in *Amrollah*, plaintiff did not obtain asylum as a result of an IJ's ruling. Instead, plaintiff's asylum application was granted by the asylum office. (*See* AR 44-47.) Additionally, the government has presented arguments as to why applying the collateral estoppel doctrine in this case would contravene Congress's intent. The court finds those arguments persuasive, as explained above.

          d.     Discussion

For the forgoing reasons, the court declines to apply the doctrine of collateral estoppel to the circumstances of this case. *See Astoria Fed. Sav.*, 501 U.S. at 108 ("Courts do not . . . have free rein to impose rules of preclusion, as a matter of policy, when the interpretation of a statute is at hand[]" and the normal presumption that "Congress is understood to legislate against

/////

a background of common-law adjudicatory principles[]" does not apply "when a statutory purpose to the contrary is evident[]" (internal quotation marks omitted)).

Even if collateral estoppel applied, plaintiff cannot satisfy the required elements. Collateral estoppel applies when the following four conditions are satisfied: "(1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." *Oyeniran v. Holder*, 672 F.3d 800, 806 (9th Cir. 2012). To satisfy the second element, the disputed element in this case, it must be shown that the prior proceeding was adjudicative and adversarial in nature. *See Astoria Fed. Sav.*, 501 U.S. at 107—08; *see also Cospito v. Attorney Gen. of U.S.*, 539 F.3d 166, 171 (3d Cir. 2008) ("because applications for adjustment of status are not normally adversarial in nature, and do not involve an IJ, the petitioner's adjustment of status was not adjudicatory in nature, and thus is not entitled to res judicata effect." (internal quotation marks omitted)); *Andrade v. Gonzales*, 459 F.3d 538, 545 (5th Cir. 2006) ("applications for adjustment of status are not normally adversarial in nature, and do not involve an IJ").

Here, plaintiff has not shown that his asylum interview was adjudicative and adversarial in nature. Indeed, while applicants "may have counsel . . . , may present witnesses, and may submit affidavits of witnesses and other evidence[,]" "[t]he asylum officer shall conduct the interview in a nonadversarial manner . . . ." 8 C.F.R. § 1208.9(b). *See Cospito*, 539 F.3d at 171 ("There can be little doubt that there exists a substantial difference between the procedures employed by the agency official . . . in this case and those governing a [sic] adversarial proceeding conducted by an IJ.").

    2.  USCIS's Determination Finding Plaintiff Inadmissible

In support of his argument that USCIS's determination was arbitrary and capricious plaintiff makes two principal arguments: First, the determination "that the RPF and RPA were 'terrorist organizations' was erroneous," (ECF 14 at 2); and second, that "the historical context of events in Rwanda"—"a legitimate revolutionary struggle against a genocidal

/////

13

1 regime"—makes the operations of RPA and RPF lawful; and such activities cannot qualify as
2 terrorist activities. (*Id.* at 3.)

3 As to plaintiff's first argument, defendants respond that USCIS's determination is
4 entitled to deference by this court. (ECF 15 at 18.) As to the second argument, defendants argue
5 there is no exception in the statute for liberation actions. (*Id.* 21–22.)

6 The court addresses each argument in turn.

        a.      USCIS's Determination that the RPF and RPA were Terrorist Organizations

9 Plaintiff argues the RPF was a large and complex political organization and any
10 alleged terrorist activities committed by other sub-groups within that organization should not be
11 attributed to the organization as a whole. (ECF 14 at 25–27.) Plaintiff asserts that USCIS should
12 have conducted "a careful examination of the exact actors of the alleged terrorist activities." (*Id.*
13 at 26–27.) In essence, plaintiff argues if a particular group within the RPF or the RPA committed
14 terrorist activities, it is membership in that specific sub-group that should disqualify a person and
15 not mere membership in the parent organization; "this level of specificity is consistent with the
16 language of the statute . . . [,]" plaintiff reasons. (*Id.* at 28.)

17 Defendants respond that there is no requirement "that the group be small or that
18 the other members be identified" in order for a group to qualify as a terrorist organization. (ECF
19 15 at 20.)

20 As noted above, the INA precludes asylees who have engaged in terrorist activity
21 from seeking permanent residency in this country. *See* 8 U.S.C. § 1159(c). Section
22 1182(a)(3)(B)(i) renders inadmissible certain persons who have engaged in terrorist activity, have
23 been members or representatives of terrorist organizations, or have received military-type training
24 from a terrorist organization.

25 The statute defines "terrorist activity" as including all of the following:

26 [A]ny activity which is unlawful under the laws of the place where
 it is committed (or which, if it had been committed in the United
27 States, would be unlawful under the laws of the United States or
 any State) and which involves any of the following:
28

14

   (I) The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).

   (II) The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.

   (III) A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of Title 18) or upon the liberty of such a person.

   (IV) An assassination.

   (V) The use of any—

    (a) biological agent, chemical agent, or nuclear weapon or device, or

    (b) explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

   (VI) A threat, attempt, or conspiracy to do any of the foregoing.

§ 1182(a)(3)(B)(iii).

   Section 1182(a)(3)(B)(iv)(IV)(cc) defines "engag[ing] in terrorist activity" to include "solicit[ing] funds or other things of value for . . . a terrorist organization described in clause (vi)(III) . . . ." The Ninth Circuit has noted "[t]he statute defines 'engag[ing] in terrorist activity' broadly." *Khan v. Holder*, 584 F.3d 773, 777 (9th Cir. 2009) (alteration in original). In particular, "[a]n alien's intention in soliciting funds only for nonviolent activity is irrelevant to this definition, even when an organization has separate political and militant wings, because money donated to an organization's political wing is considered to be support for the militant wing as well." *Khan*, 584 F.3d at 777.

   The statute defines "terrorist organization" broadly as well. The definition includes "a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv)." 8 U.S.C § 1182(a)(3)(B)(vi)(III). As noted above, this type of organization is referred to as a Tier III terrorist organization. *Annachamy v. Holder*, 733 F.3d 254, 259 (9th Cir. 2013).

15

In the instant case, USCIS's conclusion was premised on the threshold finding that the RPF and RPA were Tier III terrorist organizations.  (*See* AR 2.)  In particular, USCIS found that "[t]he combat and other violent activities of RPF and RPA qualif[ied] as terrorist activities and engaging in terrorist activities as defined in INA . . . , including the use of explosives, firearms, or other weapon or dangerous devices . . . , with the intent to endanger the safety of one or more individuals or to cause substantial damage to property."  (*Id.*)  It is this threshold finding that plaintiff challenges.

The court finds that USCIS's determination that the RPF and RPA were "terrorist organizations" within the meaning of the statute is supported by the record.  It is undisputed that plaintiff was a member of the RPF and RPA (*see* AR 50); that plaintiff engaged in fundraising activities (*see id.* 49–50); and that plaintiff received military training at Gabiro Training Camp (*see id.* 50).  Further, USCIS, citing several sources, found as follows:

> . . . A Human Rights Watch (HRW) report on the Rwandan genocide documents extrajudicial executions carried out by the RPF after their occupation of Kigali in June 1994 following the genocide. HRW cites a witness who testified to mass killings carried out by the RPF, including at the Gabiro training camp. After a few days, the new recruits were reportedly transferred to a RPF post at Masaka. According to the witness, some 120 of the new recruits were assigned to a detail called "manpower," which was carried out at the headquarters of the DMI [Department of Military Intelligence] at Masaka. There the recruits killed civilians, first tying their arms and legs and then striking them in the head with a hammer or other blunt instrument. According to the witness, the bodies were burned and what remained was buried [. . . .] The witness asserted that he was transferred about one month later to a military camp at Gabiro in the Akagera game park where the same kind of slaughter and burning of bodies took place in a detention camp adjacent to the military camp (HRW March 1999).

> The Amnesty International Report 1995 on Rwanda states[:] "There were also reports of human rights abuses by the RPF and RPA. Hundreds-possibly thousands-of unarmed civilians and captured opponents were reported to have been summarily executed by the RPA and by Tutsi supporters of the RPF. Many of the killings were arbitrary reprisals against groups of Hutu civilians [. . . .] In late May and early June RPA soldiers were reported to have carried out numerous arrests of Hutu at "screening" centres in southern Rwanda used to identify those suspected of involvement in massacres and to have killed a number of them."

(AR 2.)

1        Plaintiff's argument that any alleged violent activity committed by some members
2 of RPF and RPA should not be attributed to those organizations as a whole is unsupported by any
3 authority supporting his application of the statute.  Indeed, as set forth above, the statute defines
4 terrorist organizations broadly, and the definition of a Tier III organization includes any "group of
5 two or more individuals, whether organized or not, which engages in, or has a subgroup which
6 engages in [terrorist activities]."  § 1182(a)(3)(B)(vi)(III).  In addition, plaintiff does not
7 challenge the reliability of the sources upon which USCIS relied in reaching its conclusion that
8 the RPF and RPA fell within the broad statutory definition of a Tier III terrorist organization.  *See*
9 *Haile v. Holder*, 658 F.3d 1122, 1127–30 (9th Cir. 2011) (affirming designation of the Eritrean
10 Liberation Front as a Tier III organization); *see also Chhun v. Holder*, 345 F. App'x 309, 311 (9th
11 Cir. 2009) (affirming designation of the Cambodian Freedom Fighters as a Tier III organization)
12 (unpublished).  Therefore, it cannot be said that USCIS's determination was arbitrary or
13 capricious.

14            b.    Liberation Movement

15        Plaintiff argues that the RPF's and RPA's "active military operations in opposition
16 to a recognized campaign of genocide were consistent with international law," and thus, these
17 organizations cannot be considered terrorist organizations.  (ECF 14 at 30.)  Referring to Article
18 51 of the UN Charter, plaintiff reasons that the use of force in defending against genocide is a
19 justified form of self-defense under international law.  (*Id.*)  Accordingly, because Rwanda is a
20 signatory to the Charter, plaintiff reasons, the alleged violent activities were not unlawful in
21 Rwanda in 1994 and as such they may not qualify as terrorist activities.  (*Id.*)  The court takes
22 judicial notice of Rwanda's status as a signatory to the UN Charter since September 1962.  FED.
23 R. EVID. 201; UN Charter, Declarations of Acceptance of the Obligations Contained in the
24 Charter of the United Nations - Admission of States to Membership in the United Nations in
25 Accordance with Article 4 of the Charter (status as of Sept. 8, 2014).

26        Defendants respond that there is no exception under the statute for "freedom
27 fighters."  (ECF 15 at 22.)  Further, defendants respond plaintiff has not met his burden of
28 introducing "some evidence that [Rwanda] has incorporated such international law" because

17

plaintiff merely "points to Rwanda's status as a signatory to the [UN] [C]harter," and that is not sufficient. (ECF 18 at 7–8.)

As noted above, § 1182(a)(3)(B)(iii) defines "terrorist activity" to include certain violent acts that are "unlawful under the laws of the place where [they are] committed (or which, if [they] had been committed in the United States, would be unlawful under the laws of the United States or any State)." The statutory language makes no exception "for actions that are lawful under international law." *Khan*, 584 F.3d at 781. Accordingly, the Ninth Circuit in *Khan* held "that the definition of 'terrorist activity' under the INA does not provide an exception for armed resistance against military targets that is permitted under the international law of armed conflict." *Id.* at 784. Nevertheless, the court noted that "[a]n action would be lawful within the meaning of § 1182(a)(3)(B)(iii) if the law of the country in question incorporates international law such that the conduct in question is no longer 'unlawful' under the country's domestic law . . . ." *Id.* at 781.

In a subsequent decision addressing a similar argument that a legitimate armed resistance against unlawful military conduct does not qualify as "terrorist activity," the Ninth Circuit affirmed the holding of *Khan*. *See Annachamy*, 733 F.3d at 260 n.5. In *Annachamy*, the plaintiff argued that the case should be remanded to the relevant immigration agency "to consider whether Sri Lanka has incorporated international law, such that the [organization's] activities were not unlawful under Sri Lankan domestic law." *Id.* The Ninth Circuit declined plaintiff's invitation to remand because the plaintiff provided no evidence that Sri Lanka had incorporated international law. *Id.*

In the present case, plaintiff has provided argument based on Article 51 of the UN Charter that the alleged actions by the RPF and RPA were not unlawful in Rwanda during the relevant period. Because USCIS did not have the opportunity to address those arguments, the court REMANDS the case to USCIS to consider them. The parties do not dispute that remand is a proper exercise of this court's authority. (*See* ECF 18 at 9 ("To the extent that the [c]ourt finds that reference to the [UN] Charter is enough to raise a question of the legality of the RPF/RPA's actions[,] . . . the appropriate course of action is to remand the matter to USCIS for consideration

of that question in the first instance.").)  In remanding the case, the court expresses no opinion as to the ultimate viability of plaintiff's arguments.

## VI. CONCLUSION

For the foregoing reasons, the court DENIES plaintiff's Motion for Summary Judgment and GRANTS in part and DENIES in part defendants' Motion for Summary Judgment. The case is REMANDED to USCIS to determine whether plaintiff's actions were lawful in light of plaintiff's arguments based on the UN Charter.

IT IS SO ORDERED.

DATED: September 11, 2014.

_____
UNITED STATES DISTRICT JUDGE